**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTIRCT OF NEW YORK**

| | |
|---|---|
| S.G. and M.G., on behalf of themselves and others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>Bank of China Ltd., Bank of China U.S.A., BOC International Holdings Ltd., BOCI Commodities & Futures (USA) LLC, CME Group Inc., and New York Mercantile Exchange, Inc.,<br><br>     Defendants. | Civil Action No. 23-cv-2866<br><br><br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiffs S.G. and M.G. ("Plaintiffs"), by and through their undersigned counsel, bring this action on behalf of themselves and all others similarly situated against Defendants Bank of China Ltd., Bank of China U.S.A., BOC International Holdings Ltd., BOCI Commodities & Futures (USA) LLC, CME Group Inc. and New York Mercantile Exchange, Inc.

Plaintiffs make the following allegations based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## **NATURE OF THE ACTION**

1. Plaintiffs bring this class action lawsuit on behalf of all similarly situated customers of Defendant Bank of China Ltd. in and outside China, who were lured to purchase the Crude Oil Treasure (the "COT") between January, 2018 and April, 2020 and suffered staggering

loss. Defendants Bank of China Ltd., Bank of China U.S.A., BOC International Holdings Ltd. and BOCI Commodities & Futures (USA) LLC colluded in an unlawful scheme to devise, implemented and marketed to mass retail market the COT in violation of Commodity Exchange Act (CEA), 7 U.S.C. § 1, et seq., and other applicable laws and regulations. The COT is an extremely risky derivative investment product encapsulating the West Texas Intermediate ("WTI") light sweet crude oil futures contracts traded on the NYMEX, a futures and options exchange owned and operated by Defendants CME Group Inc. and New York Mercantile Exchange, Inc.

2.      In so doing, Defendants Bank of China, Bank of China U.S.A., BOC International Holdings Ltd. and BOCI Commodities & Futures (USA) LLC collected more than $10.8 billion funds from Plaintiffs as the full security deposit for COT accounts, a fraction of which were used by those Defendants for the WTI futures contracts while most of Plaintiffs' funds were misappropriated by Defendants Bank of China, Bank of China U.S.A., BOC International Holdings Ltd. and BOCI Commodities & Futures (USA) LLC and were fraudulently transferred in U.S. Dollar into the U.S. through the systems of Federal Reserve of New York for unrelated and undisclosed purposes.

3.      Further, Defendants Bank of China, Bank of China U.S.A., BOC International Holdings Ltd. and BOCI Commodities & Futures (USA) LLC managed the COT in a reckless and negligent manner, especially in the case of May 2020 WTI futures contracts ("WTI2005"), in breach of their contractual and fiduciary duty owed to Plaintiffs, resulting in irreparable and severe harm to Plaintiffs.

4.      In all relevant period of time, Defendants CME Group Inc. and NYMEX Inc. facilitated, aided and abetted or willfully neglected Defendants Bank of China, Bank of China

U.S.A., BOC International Holdings Ltd. and BOCI Commodities & Futures (USA) LLC fraudulent acts, as well as failed to exercise due diligence to prevent market disruption, causing severe damages to Plaintiffs.

## JURISDICTION AND VENUE

5.       The Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because the Plaintiffs' cause of action is pursuant to the CEA, 7 U.S.C. § 1, et seq.

6.       The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)28 and pursuant to  28 U.S.C. §1332(d)(2)(A) as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregated claims of the individual class members exceeds $5,000,000, exclusive of interest and costs.

7.       The venue is proper in this District pursuant to 7 U.S.C. §25(c) and 28 U.S.C. § 1391 because Defendants Bank of China U.S.A., BOCI Commodities & Futures (USA) LLC and New York Mercantile Exchange, Inc. are residents of the State of New York; Defendants Bank of China Ltd. and BOC International Holdings Ltd. are not the residents of the U.S. but conducts substantial business in the State of New York; Defendant CME Group Inc. maintains office and conduct substantial business in the State of New York; and a substantial part of the events or omissions giving rise to the claims occurred in this District by virtue of (1) Defendants Bank of China Ltd., Bank of China U.S.A. and BOC International Holdings Ltd. committed fraudulent and negligent acts by routing customers' funds though the system of Federal Reserve of New York; and (2) Defendants Bank of China Ltd. and BOCI Commodities & Futures (USA) LLC traded WTI futures contracts in question on that NYMEX located in this this District.

8.      Defendants made use of the means and instrumentalities of the interstate commerce in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

9.      Plaintiffs S.G. and M.G. are husband and wife. S.G is a resident of China and M.G. is a resident of the State of New York. The other similarly situated Plaintiffs consist of more than 60,000 investors of Defendant Bank of China Ltd.'s COT between January, 2018 and April, 2020 and suffered loss. Plaintiffs S.G. and M.G. wish to proceed under pseudonyms until the Court order otherwise for reasons set forth in details in the accompanying Motion to Proceed Under Pseudonyms.

10.     Defendant Bank of China Ltd. (the "BOC") is a Chinese state-owned commercial bank headquartered at 1 Fuxingmen Nei Dajie, Beijing, China. BOC is the fourth largest bank in the world. BOC was once designated China's central bank and is China's official foreign exchange bank for RMB that is not freely exchangeable with other currencies.

11.     Defendant Bank of China U.S.A. (the "BOC USA") is the U.S. branch of Defendant BOC headquartered at 1045 Avenue of Americas, New York, NY 10018.

12.     Defendant BOC International Holdings Ltd. (the "BOCI"), a wholly owned subsidiary of BOC, is one of the first investment bank established in China and one of the strongest Chinese investment banks in overseas market. Defendant BOCI is incorporated in Hong Kong at 26/F., Bank of China Tower, 1 Garden Road, Hong Kong and has its New York Office at 1045 Avenue of Americas, 15th Floor, New York, NY 10018.

13.     Defendant BOCI Commodities & Futures (USA) LLC (the "BOCI USA"), a

4

wholly owned subsidiary of Defendant BOCI, is incorporated in the State of Delaware and headquartered at 1045 Avenue of Americas, 15th Floor, New York, NY 10018.

14.     Defendants BOC, BOC USA, BOCI and BOCI USA are referred to hereinafter collectively as Defendant BOC Group.

15.     Defendant CME Group Inc. (the "CME"), incorporated in the State of Delaware and headquartered in Chicago, maintains its New York office at 300 Vesey Street, New York, NY 10282. Defendant CME is the holding company for several financial derivatives exchanges including CME, CBOT, NYMEX, COMEX, NEX and their respective subsidiaries. Defendant CME is the world's largest operator of financial derivatives exchanges. Defendant CME also operates the clearing house to clear, settle and guarantee futures and options contracts traded through its exchanges.

16.     Defendant New York Mercantile Exchange, Inc. (the "NYMEX Inc."), a subsidiary of Defendant CME, is incorporated in the State of New York and headquartered at 300 Vesey Street, New York, NY 10282. Defendant NYMEX Inc. operates NYMEX for the trading of futures and options contracts, including the trading of futures contracts of crude oil that gave rise to Plaintiffs' claims.

17.     Defendants CME and NYMEX Inc. are referred to hereinafter collectively as Defendant CME.

## FACTS

### A.  Background

18.      West Texas Intermediate (WTI) crude oil is a "commodity" and is the "commodity underlying" the WTI crude oil futures contracts traded on the NYMEX, as those terms are defined and used in CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

19.     The NYMEX is the world's largest physical commodity futures exchange. WTI futures contracts are the world's most liquid oil contracts.

20.     The trading of WTI futures contracts is based on margin and highly leveraged and as a result, a fully leveraged account can be completely wiped out due to a small fluctuation of price.

21.     Speculating in commodity futures and options is a volatile, complex and risky venture that is rarely suitable for individual investors or "retail customers". Most participants in the futures markets are commercial or institutional commodities producers or consumers who trade for hedging purposes to maximize the value of their assets, and to reduce the risk of financial losses from price changes.

22.     Trading in NYMEX WTI crude oil futures contracts is subject to the rules and regulations of CME and prices are quoted in U.S. dollars and cents per barrel. The CFTC and CME set the month position limit of 3000 contracts for WTI futures contracts in all relevant period of time.

23.     Defendant BOC Group developed COT for COT customers to directly trade first-line WTI futures contracts on the NYMEX, i.e., the oil futures contracts for the nearest month.

24.     The Commodity Exchange Act (CEA) requires firms and individuals that conduct business in the derivatives industry to register with the Commodity Futures Trading Commission (CFTC).

25.     Under CFTC regulations, Companies and individuals who handle customer funds or give trading advice must register with the National Futures Association (NFA), a self-regulatory organization approved by the CFTC. Particularly, a Futures Commission Merchant (FCM), which is an  organization that solicits or accepts orders to buy or sell futures contracts, options on futures,

retail off-exchange forex contracts or swaps, accepting money or other assets from customers to support such orders, must register with NFA. Defendant BOC Group was required to but was not register with NFA.

26.     The CFTC seeks to protect customers by requiring that market risks and past performance to be disclosed to prospective customers and customer funds to be kept in accounts separate from the firm's own funds.[1] Neither requirement was met by Defendant BOC Group as set forth in details below.

27.     The Currency and Foreign Transactions Reporting Act of 1970, which is commonly referred to as the "Bank Secrecy Act" (BSA), 12 U.S.C. 1829b.

28.     The Bank Secrecy Act (BSA), as enhanced by the USA Patriot Act of 2001 and the Anti-Money Laundering Act of 2020, requires financial institutions to establish Anti-Money Laundering (AML Programs). Accordingly, Defendant CME has internal dedicated department that designs and executes the Anti-Money Laundering (AML)/Know Your Customer (KYC) programs associated with the onboarding and monitoring of clients for regulated businesses, including verification of the customers identity and application of enhanced due diligence to accounts involving foreign person. However, Defendant CME should but failed to detect, deter and prevent Defendant BOC Group's fraudulent acts in concealing the true identity of the COT customers.

29.     As a Designated Contract Market (DCM), Defendant CME must comply, on an initial and ongoing basis, with the twenty-three Core Principles established in CEA, 7 U.S.C. 7(d) and Part 38 of the CFTC's regulations, inter alia, prevention of market disruption.

**B.   Defendant BOC Group's Fraudulent Scheme**

---

[1] https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/FuturesMarketBasics/index.htm

30.     As a commercial bank, Defendant BOC was not approved by China Banking & Insurance Regulatory Commission ("CBIRC") for business of directly selling derivative financial products, such as COT, to retail customers.

31.     Nevertheless Defendant BOC Group sold COT to mass retail market between January, 2018 and April, 2020. Defendant BOC Group carried out trading and clearing of COT's WTI crude oil futures contracts at CME through Defendant BOCI and BOCI USA.

32.     To go around the regulations, Defendant BOC Group launched COT as a wealth management product in January 2018. However COT is not listed as a wealth management product on Chinawealth.com.cn, an official website designated by CBIRC for the verification of wealth management product in the face of rampant financial frauds in China.

33.     Defendant BOC Group knowingly misclassified COT as a wealth management product, which is an alternative to CDs, and listed COT on the wealth management section of its app so that it can sell COT to a broad base of inexperience investors with little knowledge of investment products and the risks. More egregiously, BOC purposefully assessed COT as wealth management product of level R3 associated with low risks when the nature and characteristics of COT clearly demonstrate an investment products of high risks.[2]

34.     Defendant BOC Group misrepresented to prospective COT customers that it was approved by CBIRC to sell COT.

35.     Defendant BOC Group aggressively and purposefully marketed COT as highly lucrative product with low risk for inexperienced investors as shown in its advertisements, one of which stated: "Is there a profitable but interesting product for a new investor without any financial

---

[2] According to CBIRC Order 2011 No. 5 "Administrative Measures for the Sales of Wealth Management Products of Commercial Banks", products with risk level R3 have low risks.

knowledge? Absolutely! That is Crude Oil Treasure!"  "Whether the price of crude oil rises or falls, Crude Oil Treasure can always make you money".  In 2018, BOC's financial manager promoted COT on Beijing Television of Finance: "Crude Oil Treasure can act as a hedging tool for your daily oil use. If the investor holds a certain crude oil position, this increased cost of gasoline will be hedged when the oil price rises. Also, the Crude Oil Treasure is not leveraged, and the risk is not particularly high". On March 27, 2020, Defendant BOC Jiangxi published promotional materials titled "Crude Oil is cheaper than water, Let Bank of China take you to trade oil" where Defendant BOC claimed that a COT customer traded "black gold" and made 37% profit in five days starting March 5, 2020.

36.     The "Bank of China Ltd. Individual Account Commodity Trading Agreement" (the "COT Agreement") was purported to be the agreement between Defendant BOC and the COT customers.

37.     The COT Agreement warned the customers could lose the principal but no mention of the possibility that customers could lose more money than they invested.

38.     The COT Agreement required customers to provide 100% security deposit in Chinese RMB or US Dollars before they could even start trading the oil futures contracts. No margin or leverage was available. In other words, the COT customers traded on cash basis.

39.     When COT customers purchased COT, they did in the same way as purchasing other wealth management product or CDs, putting all money into the product and keeping no cash because the cash in the COT accounts earned no interest.

40.     The COT Agreement stipulates that BOC continuously monitors each COT account and will notify the customers via text message in the event that the net security deposit of the account falls below 50% of the value of the initial position, which in all likelihood means the

account lost 50% of initial investment. Upon receiving the notification of deficiency of security deposit, the customers can make additional cash deposit to meet the security deposit requirements. More, BOC will automatically liquidate the COT account in the event the net security deposit drops below 20% of the value of the initial position. But Defendant BOC oftentimes did neither warn the customers nor automatically liquidate the COT accounts, especially when the price of WTI2005 entered the negative price territory for the first time in history on April 20, 2020.

41.     In contrast, the trading of WTI futures contracts on CME is based on margin and leveraged. The initial margin is the initial amount of money the Defendant CME requires for a trader to open a futures position. The amount is established by CME and is a percentage of the value of the futures contract. For WTI futures contracts, Defendant CME sets initial margin requirements that can be as little as 5% or 10% of the contract to be traded. For example, WTI contract futures contract on CME is for 1,000 barrels of oil. At $85 per barrel, the notional value of the contract is $85,000. A trader, however, is only required to place around $5,000 per contract into an account. The maintenance margin amount is even less than the initial margin. Defendant BOC Group required the COT customers to made full security deposit but used only a fraction of the security deposit to set up WTI futures contracts trading on CME. In the above example, Defendant BOC Group required the COT customer of a full security deposit of $85,000, but deposited only $5,000 of the COT customer's fund with CME to buy the contracts.

42.     In violation of related regulations, the vast amount of COT customers' funds of more than $10.8 billion were fraudulently and unlawfully routed and transferred by Defendant BOC Group through the system of Federal Reserve of New York into the U.S. financial market for unrelated and undisclosed purposes. The source of the funds and the identity of the owner are concealed in violation of BSA and related regulations.

43.     In addition, Defendant BOC Group obscured the true identity of the owners of COT WTI futures contracts and fraudulently dispersed the WTI futures contracts positions in different shell accounts to circumvent the WTI future contracts month position limit of 3000 contracts.

**C.  Defendant BOC Group's Reckless Management of COT**

44.     Things went from bad to worse for the COT customers due to a serial of disastrous decisions made by Defendant BOC Group. First, Defendant BOC Group decided on a bizarrely wrong rollover day. Rollover is the standard practice in futures contracts trading where the front month contract that is close to expiration is rolled over to another contract in a further-out month. The industry standard practice is that the rollover is completed at least four days, most likely seven days before the settlement day of the contract because the trading becomes volatile, and the liquidity is low, which makes it difficult to execute orders, as the contract approaching to the settlement day.  Unlike BOC's peers in China that offered investment products similar to COT, including Industrial and Commercial Bank of China (ICBC) that set the rollover day seven days prior to the settlement day, BOC set rollover date right on the settlement day. In the case of WTI2005, the last trading day was April 21, 2020 and the settlement day was April 20, 2020, which was also the day of COT WTI2005 rollover set by Defendant BOC Group. To exacerbate the matter, BOC did not automatically roll over the May 2020 WTI future contract for the COT customers who so chose.

45.     Second, Defendant BOC Group did not warn the COT customers or automatically liquidate the COT accounts on April 20, 2020 when the price of WTI2005 dropped to the level to trigger such warning or automatic liquidation as stated in the COT Agreement.

46.     More, Defendant BOC Group used Trade at Settlement (TAS) order that settles the

order based on the Exchange-determined daily settlement price.[3]   For TAS orders, the final

settlement price is the same for each no matter when the order was executed. Consequently

Defendant BOC Group was not able to roll over the WTI2005 contracts on the last trading day at

the actual price at the time of order execution. Nor was BOC able to liquidate the position at the

actual trading price. No other participant on NYMEX WTI oil futures contracts trading would have

made such deadly combination of choice, i.e., rollover on last trading day and TAS, as BOC did.

47.     The alternative to rollover is spot delivery of crude oil, under which the long

position holder will take the physical delivery of the crude oil under the contract regardless of the

final settlement price. Only who had the capacity to accept physical delivery of oil would keep the

contracts until the expiration. Although Defendant BOC Group knew of its lack of the capacity to

take physical delivery of the massive amount of oil under the COT WTI2005 contracts, Defendant

BOC Group made the choice not to roll over the COT WTI2005 contracts and not to liquidate

those contracts when the price was still positive and  instead, kept the COT WTI2005 contracts

until the expiration for cash settlement at the worst possible price.

48.     Further, Defendant BOC dealt COT customers with another fatal blow by

recklessly and arbitrarily restricted the trading time for COT customers. Defendant BOC set the

COT trading hours as 9:00am to 10:00pm, Beijing time, daily, corresponding to 9:00pm to

10:00am EST while the CME trading hours are 6:00pm to 5:00pm EST and for TAS orders 6:00pm

to 2:30pm EST. It can be clearly seen Defendant BOC closed COT trading in the midst of CME

trading session. As the result, COT customers was not able to take immediate action if the sudden

change in market conditions occurred as on April 20, 2020. In the aftermath of the tragic event for

---

[3]  Daily settlement prices of NYMEX WTI crude oil futures are settled at the volume-weighted
average price ("VWAP") of trades occurring on Globex between 2:28 and 2:30 p.m., EST.

COT customers on April 20, 2020, Defendant BOC released a COT Agreement in response to the public rage where the COT trading hours were changed to 9:00am to 4:00am, Beijing time, to cover up its wrongdoings.

49.     There were earlier warning signs that Defendant BOC Group should have heeded. On April 8, 2020, Defendant CME released CME clearing plan to address the potential of a negative underlying in certain energy options contracts.

50.     On April 15, 2020, Defendant CME announced the new policy that allows the negative prices for certain energy futures contracts, including crude oil futures. By accident or not, the first-ever negative price for oil future contract occurred immediately after the announcement.

51.     Defendant BOC Group completely ignored the possibility of negative oil price as shown in its inaction in notifying the Plaintiffs or planning accordingly.

52.     Not only did Defendant BOC Group not heed the CME announcement, but Defendant BOC Group also continued to push the false narrative that the COT was without risk. On April 18, 2020, Defendant BOC published an article titled "Must Read for COT Rollover", declaring that the COT customers would not face any potential loss caused by rollover. On April 19, 2020, Defendant BOC broadcast text messages to the COT customers, stating that WTI2005 would expire on April 21, 2020 and the trading would be terminated on 10:00pm Beijing time on April 20, 2020, followed by automatic rollover. However, the automatic rollover was not done by Defendant BOC Group.

53.     A properly designed and executed rollover scheme, as completed by other market participants, e.g., U.S. Oil Fund (USO) and ICBC,  would have safely transfer customer's fund to June 2020 WTI futures contracts. But the COT customers were forced by Defendant BOC Group to settle for the worst-ever price for WTI2005 because CME set the settlement price for all TAS

orders as -$37.63 a barrel based on the average price from 2:28 pm to 2:30 pm EST (2:28 am to 2:30 am Beijing time).

54.     If Defendant BOC Group had managed to avoid the cash settlement of the COT WTI2005 at -$37.63, the lowest point of the price, Plaintiffs would not have suffered such devastating loss. On April 21, 2020, the last trading day for WTI2005, the price recovered and closed at $10.01 a barrel after reaching the lowest price of -$37.63. That was a $47.64 a barrel increase from the negative price that Defendant BOC Group settled with Defendant CME for the COT customers. A COT customer who made a full security deposit of $3,500 and purchased the WTI2005 for 100 barrels at $35.00 a barrel for $3,500 on April 13, 2020 would lost $7,263, but would have lost only $2,499 if the contracts somehow had survived Defendant BOC mismanagement and had been settled at the closing price.

55.     On April 20, 2020, Defendants BOCI and BOCI USA, as the brokers for COT WTI2005, should have automatically liquidated the COT accounts that held COT WTI2005 under the CME rules when the maintenance margin requirements, which is approximately 5% to 10% of the account position, were breached. At that time, the WTI2005 price was still above zero. Defendants BOCI and BOCI USA did not carry out the automatic liquidation of the COT accounts as specifically instructed by Defendant BOC.

56.     As the result, the COT customers have lost more than $1.6 billion but Defendant BOC Group could not care less about the COT Customers given its enormity in power and scale. In China, Bank of China is the Chinese government. In 2000, Bank of China Ltd. reported $3.54 trillion in assets, $2.45 trillion in customer deposits, $81.96 in revenue and $35.71 billion in profits.

57.     Defendant BOC Group collected vast amount of fees from the COT customers trading WTI future contracts, gambled the COT customers' money but shieled itself from any loss.

**D.  Defendant CME's Wrongdoings**

58.     Pursuant to BSA and related regulations, Defendant CME implemented the Anti-Money Laundering (AML)/Know Your Customer (KYC) programs for the purposes of verifying the customers identity and apply enhanced due diligence to accounts involving foreign person. However, Defendant CME should but failed to detect, deter and prevent Defendant BOC Group's fraudulent acts, including its concealment of the true identity of the COT customers and shell accounts for the COT oil futures contracts.

59.     For the purposes of raking in a great deal of fees, Defendant CME facilitated, aided and abetted, or willfully neglected Defendant BOC's unlawful scheme by permitting Defendant Group's illicit trading of WTI futures contracts on the NYMEX, also by ignoring Defendant BOC Group's scheme in hiding the identity of the true owners of the COT WTI futures contracts and the use of shell accounts.

60.     On April 15, 2020, Defendant CME announced the new policy that allows the negative prices for certain energy futures contracts, including crude oil futures in a hasty and negligent way without thorough study and research on the negative price's impact on the market. By accident or not, the first-ever negative price for oil future contract occurred immediately after the announcement.

61.     On April 20, 2020, Defendant CME failed to force liquidate the COT accounts that held COT WTI2005 pursuant to the published rules when the exchange maintenance margin requirements, which is approximately 5% to10% of the account position, were breached. As a result, the COT customers lost the opportunity to liquidate the WTI2005 contact at positive prices.

62.     Under CEA and related CFTC regulations, Defendant CME is obligated to prevent market disruption. In this regard, Defendant CME failed to exercise diligence to intervene or

trigger circuit break under the trading rule or on its discretion to halt the unusually volatile trading of WTI2005. On April 20, 2020, the price of WTI 2005 traded at a negative price and settled at -$37.63 a barrel. This was the first time in history and probably the last time ever that the NYMEX WTI crude oil futures contracts are traded at a negative price. The largest trading range on any day of the last three days of trading in a WTI light sweet crude oil futures contracts was approximately $26.65 per barrel from 2000-2019. However, the trading range on April 20, 2020 spiked to approximately $58.17 a barrel. Those market conditions required and justified Defendant CME' intervention as other exchanges would do. But CME has done nothing while enjoying the fees rolling in.

### E.  <u>Plaintiffs' Ordeal</u>

63.     The same as 90% of the COT customers, Plaintiffs S.G. and M.G. were new investors with no prior investment experience and little knowledge of financial products. They opened a COT account in March, 2020 after receiving BOC advertisements on COT and COT promotional materials from BOC manager of wealth management products. Defendant BOC did not ask questions about Plaintiffs S.G. and M.G's investment experience, investment goal, assets, or risk tolerance levels before BOC opened the COT trading account for Plaintiffs to start trading oil futures contracts. Nor did BOC require Plaintiffs to sign the COT Agreement.

64.     Defendant BOC did not explain the details of the COT and the risks associated with COT and the trading of oil futures contracts.

65.     Plaintiffs S.G. and M.G. made an initial deposit of $260,000 into the new COT account in March, 2020 and started trading WTI futures contracts immediately through the BOC app on mobile phones in the same way as most COT customers.

66.     Plaintiffs S.G. and M.G. did not receive any warning messages and their account

was not liquidated by Defendant BOC Group as promised.

67.     A large number of the COT Customers lost their lifetime savings. Plaintiffs S.G. and M.G. lost all their investment on April 20, 2020 and Defendant BOC Group demand an additional payment of $250,000 due to the negative settlement price.

68.     Many COT customers in China sought legal assistance but hit the wall. In May, 2020, under the pressure of Chinese government and Defendant BOC Group, several famous law firms in China, including Beijing DHH Law Firm, Beijing VLaw Law Firm, and Yingke Law Firm, declined the request for legal representation despite actively soliciting the COT customer initially, citing the "special nature of the case" and publicity.

69.     In addition, several courts in different geographic locations in China refused to accept the cases filed by the COT customers. The courts did not even allow the COT customers to submit the complaint.

70.     Having no other choice, Plaintiffs S.G. and M.G. and many other COT customers filed complaints with Defendant BOC Group and CBIRC but have not received any response.

71.     The COT customers, including Plaintiffs S.G. and M.G., also organized on social media platforms for unity and coordinated appeal to local and central government in China. In response, the Chinese government cracked down on the many groups. Plaintiffs S.G.'s calls and online activities have been monitored and recorded. Plaintiff S.G.'s social media accounts were deleted for several time and he was asked to "drink tea" with the police on many occasions to be interrogated and warned about his involvement in the COT customers' organized movement to seek compensation from Defendant BOC Group.

72.     Up to date the issue remains unresolved and the efforts to suppress Plaintiffs and other COT customers are ongoing.

**F.   In the Aftermath of April 20 Catastrophe**

73.     In the wake of the catastrophic COT loss on April 20, 2020, Defendant BOC Group make a serial public announcements in response to the public rage.

74.     On April 21, 2020, Defendant BOC Group suspended the COT trading.

75.     On April 22, 2020, Defendant BOC Group made two announcements that the settlement price of  -$37.63 for COT WTI2005 is valid and confirmed. Defendant told COT Customers who had already been wiped out that they had to compensate Defendant BOC for the negative value of their holdings when those were sold or risk hurting their credit rating.

76.     On April 29, 2020, Defendant BOC Group through its counsel dispatched a letter to Defendant CME, making inquiry on the reasons to the unusually volatile WTI futures contract trading on April 21, 2020.

77.     On May 5, 2020, Defendant BOC Group's announcement blamed the COT loss on Covid and market volatility, sought amicable solution with COT customers and reserved its rights in pursuit of legal ramification against external parties for damages.

78.     In response to Defendant BOC's violations of laws and regulations and the ensuing publicity, CBIRC fined Defendant BOC RMB 50.5 million ($7.3 million); reprimanded and fined two general managers of global marketing department of Defendant BOC RMB 500,000 ($72,000); reprimanded and fined and two deputy general managers and senior traders of the global marketing department of Defendant BOC RMB 400,000 ($58,000). This was merely a slap on the wrist.

79.     CIBRC further cited problems with contract terms and Defendant BOC's internal controls, including unreasonable incentives for its staff. CIBRC also said some customers were allowed to invest despite being too young to purchase COT, and Defendant BOC used exaggerated advertising and offered gifts to lure customers.

## **COUNT ONE**

**Violation of Commodity Exchange Act (CEA), 7 U.S.C. § 1, et seq.**
**And Related Regulations**
**Against Defendant BOC Group**

80.     Plaintiffs repeats and incorporates by reference each of the allegations set forth in the preceding paragraphs.

81.     Defendant BOC Group filed to register with NAF, as designated by CFTC, to sell WTI future contracts and related services to Plaintiffs and other COT customers.

82.     Defendant marketed COT to retail bank customers in a fraudulent and unlawful way.

83.     Defendant BOC Group failed to make proper disclosure to the COT customers.

84.     Defendant BOC Group misappropriated the COT customers' funds.

85.     Defendant BOC Group unlawfully concealed the true identity of owners of COT WTI future accounts.

86.     Defendant BOC Group used shell accounts to go around CFTC regulations regarding month position limit.

87.     Plaintiffs have been damaged in their property, including, but not limited to, their investment in COT by reason of Defendants' unlawful acts and are entitled to recover compensatory damages suffered and punitive and exemplary damages sufficient to deter Defendant BOC Group from committing such unlawful and fraudulent conducts in the future, plus attorney's fees and costs.

## COUNT TWO

### Violation of N.Y. Gen. Bus. Law § 350
### Against Defendant BOC Group

88.     Plaintiffs repeats and incorporates by reference each of the allegations set forth in the preceding paragraphs.

89.     New York State legislation prohibits false advertising in the conduct of any business, trade or commerce or in the furnishing of any service, N.Y. Gen. Bus. Law § 350.

90.     Defendant BOC Group utilized false advertising online and on mobile devices to market COT and furnish services related to COT in violation of the State of New York statute.

91.     Plaintiffs have been damaged in their property, including, but not limited to, their investment in COT by reason of Defendants' unlawful false advertising and are entitled to recover compensatory damages suffered and punitive and exemplary damages sufficient to deter Defendant BOC Group from committing such unlawful and fraudulent conducts in the future, plus attorney's fees and costs.

## COUNT THREE

### Claim of Frauds Against Defendant BOC Group

92.     Plaintiffs repeats and incorporates by reference each of the allegations set forth in the preceding paragraphs.

93.     Defendant BOC Group sold unlawful COT to Plaintiffs and COT customers through misrepresentation, including regulatory approval to sell COT, high profit, no risk, notification of low security deposit balance, automatic rollover and automatic liquidation.

94.     Defendant BOC Group falsely promised to Plaintiffs and COT customers that it would diligently protect the COT customers' interest.

95.     Defendant BOC misappropriated the COT customers' funds without disclosure.

96.     Defendant BOC Group made the false representation or omission fully aware of its falsity.

97.     Defendant BOC Group made the false representation or omission for the purpose of defrauding the COT customers into purchasing the unlawful COT.

98.     Plaintiffs replied on Defendant BOC Group's false representation or omission to purchase the COT and manage their COT accounts.

99.     Plaintiffs have been damaged in their property, including, but not limited to, their investment in COT by reason of Defendants' fraudulent acts and are entitled to recover compensatory damages suffered and punitive and exemplary damages sufficient to deter Defendant BOC Group from committing such unlawful and fraudulent conducts in the future, plus attorney's fees and costs.

## COUNT FOUR

### Claim of Conspiracy to Defraud Against Defendant BOC Group

100.    Plaintiffs repeats and incorporates by reference each of the allegations set forth in the preceding paragraphs.

101.    Defendants BOC, BOC USA, BOCI and BOCI USA colluded for the scheme to sell the unlawful COT to retail customers, conceal the true identity of the COT customers, misappropriate customer funds and use shell account to circumvent the regulations.

102.    Defendants BOC, BOC USA, BOCI and BOCI USA willfully and fully participated in the unlawful scheme and worked in furtherance of the unlawful scheme by, but not limited to, selling COT to retail customers, facilitating the illicit trading of COT WTI future contracts and transferring misappropriated customer funds into the U.S. financial systems.

103.    Plaintiffs have been damaged in their property, including, but not limited to, their investment in COT by reason of Defendant BOC Group's conspiracy of frauds and are entitled to recover compensatory damages suffered and punitive and exemplary damages sufficient to deter Defendant BOC Group from committing such unlawful and fraudulent conducts in the future, plus attorney's fees and costs.

## COUNT FIVE

### Claim of Breach of Contract Against Defendant BOC Group

104.    Plaintiffs repeats and incorporates by reference each of the allegations set forth in the preceding paragraphs.

105.    Defendant BOC Group failed to perform under the COT Agreement.

106.    As the result of these breaches, Plaintiffs have been damaged as determined at trial.

## COUNT SIX

### Breach of Fiduciary Duty Against Defendant BOC Group

107.    Plaintiffs repeats and incorporates by reference each of the allegations set forth in the preceding paragraphs.

108.    Defendant BOC Group provided service related to COT to Plaintiffs for fees and acted as the agent of Plaintiffs and the COT customers to trade COT WTI futures contracts.

109.    Defendant BOC Group was also the custodian of Plaintiffs and the COT customers' funds.

110.    Defendant BOC Group owed fiduciary duty to Plaintiffs and the COT customers.

111.    Defendant BOC Group's misconducts including but not limited to mismanagement of COT and misappropriation of customer funds constitutes breach of its fiduciary duty to Plaintiffs.

112.     As the result of these breaches, Plaintiffs have been damaged as determined at trial.

## COUNT SEVEN

### Claim of Negligence Against Defendants BOC Group And CME

113.     Plaintiffs repeats and incorporates by reference each of the allegations set forth in the preceding paragraphs.

114.     Defendant BOC owes a duty of care to Plaintiffs.

115.     Defendant BOC Group's reckless management of COT in relation to its risk management, automatic rollover and liquidation and management of the trading of COT WTI futures contracts constitutes the breach of duty to Plaintiffs.

116.     Those negligence acts are the direct and proximate cause to Plaintiffs' injury.

117.     Defendant CME owes a duty of care to Plaintiffs as the customers trading WTI futures contracts on the NYMEX.

118.     Defendant CME breached the duty of care by willfully neglecting Defendant BOC Group's unlawful acts, by hastily allowing the negative oil price without due diligence and also by its inaction in preventing the market disruption.

119.     Defendant CME's negligence is the direct and proximate cause to Plaintiffs' injury.

120.     As the result of Defendants BOC Group and CME's negligence, Plaintiffs have been damaged as determined at trial.

## COUNT EIGHT

### Claim of Aiding and Abetting Against Defendant CME

121.     Plaintiffs repeats and incorporates by reference each of the allegations set forth in the preceding paragraphs.

122.    Defendant CME knowingly and willfully aided and abetted Defendant BOC Group to trade the unlawful COT WTI futures contracts.

123.    Defendant CME knowingly and willfully facilitated and aided and abetted Defendant BOC Group in the settlement and clearing of the unlawful COT WTI futures contracts trading.

124.    Plaintiffs have been damaged and injured as a result of such aiding and abetting in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment for the following relief:

(a)     Awarding Plaintiffs compensatory damages against Defendants;

(b)     Awarding Plaintiffs punitive and exemplary damages against Defendants;

(c)     Awarding Plaintiffs their attorney's fees and costs in this action; and

(d)     For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues triable by jury.

Dated: April 5, 2023                                  Respectfully submitted,

By: _____*/s/ John Y. Tang*_____
                    John Y. Tang

John Y. Tang (N.Y. SBN: 4728580)
**Tang PC**
1702 Flushing Ave

Ridgewood, NY 11385
Telephone: (212) 363-0188
Facsimile: (212) 981-4869
john.tang@gettang.com

Wenjie Cai (N.Y. SBN: 5867569)
**Tang PC**
1702 Flushing Ave
Ridgewood, NY 11385
Telephone: (212) 363-0188
Facsimile: (212) 981-4869
ericat@gettang.com

*Counsel for the Plaintiffs*